IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 26–20–M–DWM |
| Plaintiff, | |
| vs. | ORDER |
| CRISTINA DALLAS KUNZ and AMANDA LYNN MONTOYA, | |
| Defendants. | |

On April 22, 2026, Defendants Cristina Dallas Kunz and Amanda Lynn Montoya were charged with conspiracy to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846 (Count 1), and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841, 18 U.S.C. § 2 (Count 2). (Doc. 1.) The charges arise out of a search warrant to ping Montoya's cell phone, the traffic stop of Defendants' vehicle that occurred on May 29, 2025, and the resultant searches and seizures of that vehicle, Defendants' persons, and their cell phones. Both Montoya and Kunz seek to suppress evidence resulting from these searches, seizures, and the traffic stop. (Docs. 26, 28.) The government opposes both motions. (Docs. 33, 34.) A suppression hearing was held on July 1, 2026. The government called two witnesses. Having considered

1

the parties' filings, the record evidence, and the arguments at the hearing, both motions to suppress are denied.

## BACKGROUND

### I.    Factual Background

The factual background is taken from the in-court testimony of Missoula Police Officer Clark Nissley and Montana Highway Patrol Trooper Seth Adams, the police report by Officer Nissley, (Doc. 27-1 at 2–11), the police report by Trooper Adams, (Doc. 28-14), the police report by Missoula Police Officer Rebekah Potter, (Doc. 28-10), the report of investigation by Drug Enforcement Administration Special Agent Kirk Lemmon, (Doc. 27-1 at 50–52), the search warrant applications, (Docs. 28-1, 28-4, 28-7, 28-11), the search warrants, (Docs. 28-2, 28-5, 28-8, 28-12, 33-1), and the returns on the search warrants, (Docs. 28-3, 28-6, 28-9, 28-13).  The Court finds Officer Nissley and Trooper Adams to be credible.

On April 3, 2025, Confidential Informant MH280 (the "Informant" or "MH280") informed Officer Nissley that they had messaged with Montoya on Facebook.  (Doc. 28-1 at 2.)  In those messages, Montoya indicated "that she was in possession of methamphetamine for sale" and was looking for clientele.  (*Id.*)  The Informant stated that Montoya had provided them with methamphetamine in 2024, and that the Informant had seen Montoya in possession of half a pound of

methamphetamine and 10,000 fentanyl "M30" pills. (*Id.*) On April 17, 2025, the Informant provided Montoya's cell phone number to Officer Nissley. (*Id.*) On May 1, 2025, the Informant relayed that Montoya was still involved in drug distribution in Montana, including a recent trip to Butte. (*Id.*)

On May 27, 2025, the Informant observed Montoya at a motel with methamphetamine and fentanyl. (*Id.*) Montoya was with a female identified by the Informant as "Christina Baer." (*Id.*) Baer was known to law enforcement for her role in distribution of drugs in Missoula at that time. (Nissley.) The Informant also "noted that [Montoya] is traveling quite a bit and was last known to drive a white passenger car." (Doc. 28-1 at 2.)

On May 28, 2025, Officer Nissley filed a search warrant application to ping Montoya's cell phone in real time between that day and June 26, 2025. (Doc. 28-1.) Based on that application, a search warrant was issued that same day at 2:58 p.m. (the "Ping Warrant"). (Doc. 28-2.) On May 28, at 11:25 p.m., the first ping occurred. (Doc. 28-3 at 5.)[1] The pings continued and, on May 29, Montoya's cell phone was pinged showing that she left Washington and entered Montana. (Doc. 28-3 at 4–5; *see* Doc. 27-1 at 2.) Officer Nissley contacted Trooper Adams, who was patrolling Interstate 90, for his assistance in locating Montoya, (Doc. 27-1 at

---

[1] The ping data is relayed in Greenwich Mean Time ("GMT"), which in the month of May is 6 hours ahead of Mountain time. Thus, the first ping occurred at "05:25:01 GMT," which is 11:25:01 p.m. Mountain Time. (Doc. 28-3 at 5.)

47), and relayed her general travel pattern shown by the pings, (Adams). Using these pings "in tandem with" surveillance on Interstate 90, law enforcement located a gray Kia Forte (the "Kia"). (Doc. 27-1 at 2.)

Specifically, the Kia was located by working with Spokane Sector Border Patrol Officer Tyrell Eslick, who used secure law enforcement databases to generate a list of several vehicles that were potential travel matches. (Adams.) Trooper Adams then surveilled those vehicles to determine if a driver matched Montoya's driver license photograph. (Adams.) The female driver "operating the" Kia "matched the general appearance of" Montoya, and Trooper Adams relayed this information to Officer Nissley. (Doc. 27-1 at 2, 47; Adams.) Officer Nissley discovered that the Kia was a rental car registered to "Cody Gabbard." (Doc. 27-1 at 2.) Based on his "training and experience," Officer Nissley knew that "it is common for persons involved in the transportation, sale, or purchase of dangerous drugs to utilize" a "third-party rental" "to create a layer of ambiguity and prevent law enforcement efforts to identify the persons involved in the criminal behavior." (*Id.*) This information was relayed to Trooper Adams. (*Id.*)

A traffic stop of the Kia was conducted by Trooper Adams. (*Id.*) Montoya, the driver, identified herself to Trooper Adams and the passenger was later identified as Kunz. (*Id.* at 47.) Trooper Adams asked Montoya multiple times to exit the vehicle before she exited. (*Id.*) As Kunz exited the vehicle, Trooper

4

Adams observed "a propane bottle torch head on the passenger side floorboard." (*Id.*) Both Defendants were instructed to stand at the front of the patrol car. (*Id.*) Trooper Adams explained that he stopped them as part of a narcotics investigation. (Adams.) Montoya stated that Gabbard had rented the car. (Doc. 27-1 at 48.) She was "visibly sweating." (*Id.*) Montoya did not consent to a search of the Kia. (*Id.*) At that time, Trooper Adams informed Defendants that they were detained, and that he was going to deploy his narcotics detecting K-9. (*Id.*) Kunz argued that Trooper Adams could not detain her and stated that she had property in the vehicle. (*Id.*) Trooper Adams then Mirandized both Defendants. (*Id.*) Kunz "continued to argue with" Trooper Adams regarding whether he "could detain the passenger of a vehicle during a narcotics investigation." (*Id.*) Mineral County Deputy Eric Lindauer arrived on the scene to assist Trooper Adams. (*Id.*) Kunz stated repeatedly, "search my person," but refused to answer law enforcement's questions regarding whether there were drugs present in the Kia. (Lindauer Body Cam at 2:59.) Deputy Lindauer placed Kunz in handcuffs and secured her in his patrol car. (Doc. 27-1 at 48.) At this time, Kunz's phone was seized. (Lindauer Body Cam at 3:00.) Her phone was placed on the front seat of Trooper Adams' patrol car while the investigation continued. (*Id.*) Officer Nissley then arrived on the scene. (Doc. 27-1 at 48.)

5

Trooper Adams then deployed his "narcotics detecting K9" dog,[2] "Hary," who "indicated at the front passenger door." (*Id.* at 2.) Based on this indication, as well as "the preceding collection of facts, observations, and details," Officer Nissley "believed probable cause existed to search the" Kia, including "all occupants of the vehicle and their personal possessions and physical persons." (Doc. 27-1 at 3.) Both Defendants were transported to the Mineral County Sheriff's Office to be detained pending the application of the search warrant for the Kia. (*Id.*) Montoya was placed in handcuffs before she was transported. (Lindauer Body Cam at 20:56.)

This same day, May 29, Officer Nissley applied for and was granted a search warrant for the Kia, including Defendants' physical persons and possessions. (Docs. 28-4, 28-5.) At about 12:22 p.m., Officer Nissley, other members of the Missoula Drug Task Force, and cooperating law enforcement partners executed the search warrant. (Doc. 27-1 at 3.) Prior to and during the search, Officer Nissley photographed the Kia's exterior and interior. (*Id.* at 3–7.) The warrant receipt inventory included "[t]wo Ziploc style bags containing approximately 2.3 lbs of

---

[2] This dog is "a German Shepherd and has been trained to detect the odors of cocaine, methamphetamine, Fentanyl, and heroin, and their derivatives. [He] is trained as a passive indicating canine. Trooper Adams has attended approximately 880 hours of training at the Shallow Creek Kennels K-9 Program academy and was there paired [this dog]. [This dog] and Trooper Adams successfully completed this basic course of instruction in February of 2022" and have recertified in 2024 and 2025. (Doc. 27-1 at 2–3.)

presumptive positive methamphetamine[;]" a "[b]ag containing 17.54 grams . . . of suspected fentanyl powder[;]" two scales; $1,700.00 in United States currency; a methamphetamine pipe; and Defendants' cell phones. (Doc. 28-6 at 1.)

On June 4, 2025, the search warrant for Montoya's cell phone, (Doc. 28-8), and the search warrant for Kunz's cell phone issued, (*see* Doc. 28-10 at 1). That day, Officer Potter received those search warrants and attempted to download the cell phones. (*Id.*) However, both cell phones' software "was not supported" by Cellebrite forensic analysis software, so she "returned both devices to evidence." (*Id.*) "In July 2025, Cellebrite announced more support for devices" like the Defendants' cell phones and Officer Potter updated her software. (*Id.* at 2.) She then notified Officer Nissley of the update. (*Id.*) On July 11, 2025, Officer Nissley then sought and was granted a new search warrant for Montoya's cell phone, (Doc. 28-12), and Kunz's cell phone, (Doc. 27-1 at 62–70). Officer Potter was able to access both Defendants' cell phones using the new software. (Doc. 28-10 at 2.)

On July 25, 2025, Special Agent Lemmon and Officer Nissley interviewed Gabbard. (Doc. 27-1 at 50–52.) Gabbard "stated he met [Montoya] approximately a year and a half ago" and that he "was a drug user and had purchased methamphetamine from" Montoya. (*Id.* at 50.) Gabbard "stated that he rented a car for [Montoya] on two occasions," and he "was aware the second rental was for a planned trip to pick up illegal drugs out of state." (*Id.* at 51.) This is because

Defendants "informed him they were planning to obtain their illegal drugs from Spokane, [Washington]." (*Id.*) He stated that he met Kunz "on one occasion" when he was paid $300 for renting that vehicle. (*Id.*) Gabbard stated that "he knew [Montoya] and [Kunz] were partners, working together to move illegal drugs, but that [Kunz] was above [Montoya] in that relationship." (*Id.*)

## II.    Procedural Background

On April 22, 2026, Defendants were charged with conspiracy to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846 (Count 1), and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841, 18 U.S.C. § 2 (Count 2). (Doc. 1.) On June 10, 2026, Defendants both filed motions to suppress. (Docs. 26, 28.) On June 25, 2025, the government responded. (Docs. 33, 34.) A suppression hearing was held on July 1, 2026.

### LEGAL STANDARD

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "To enforce the Fourth Amendment's prohibition against 'unreasonable searches and seizures,'" courts "exclude evidence obtained by unconstitutional police conduct." *Utah v. Strieff*, 579 U.S. 232, 234–35 (2016). "The Fourth Amendment does not proscribe all state-initiated searches and

seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Consistently, the "touchstone" of a court's analysis under the Fourth Amendment "is always 'the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (quoting *Terry, v. Ohio*, 392 U.S. 1, 19 (1968)). "[T]here is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." *Terry*, 392 U.S. at 21 (internal quotation marks omitted).

ANALYSIS

Montoya argues that the Ping Warrant is not supported by probable cause, tainting the stop of the Kia and all the subsequently collected evidence. Similarly, Kunz argues that "[i]f the government cannot prove a valid warrant issued before the pings and before the [May 29, 2025] stop, the pings and their fruits must be suppressed." (Doc. 27 at 3.) In the alternative, if the government proves a pre-stop warrant existed, Kunz insists suppression is necessary on five other grounds: the Ping Warrant is invalid due to numerous insufficiencies; during the Kia stop, the seizure of her person became a *de facto* arrest requiring probable cause, which was absent; the seizure of her phone was unlawful because it lacked probable cause; the search warrant for her phone is invalid because it is overbroad and lacks probable

9

cause; and the Gabbard-related evidence and later investigative leads are fruits of the poison tree based on the "unconstitutional [Kia] stop, [her] detention, [her] phone seizure, and phone extraction." (Doc. 27 at 16). Ultimately, both of Montoya's arguments and each of Kunz's arguments fail.

## I.  Threshold Matter

The Ping Warrant authorized law enforcement to collect "[l]attitude and longitude data" through certain "[g]lobal or regional navigation satellite system data" and "[r]eal-time location data of" Montoya's "actual cellular device" from May 28, 2025 to June 26, 2025. (Doc. 28-2 at 1.) As a threshold matter, both Montoya and Kunz argue that real-time phone pinging is a Fourth Amendment search. (Docs. 37 at 2 and Doc. 38 at 6 (both citing *Chatrie v. United States*, 609 U.S. _____ (2026), 2026 WL 1855568).)

In recent decades, the Supreme Court has explained the contours of the Fourth Amendment in the face of advancements in location tracking technology. In *United States v. Jones*, the Court held that the government's "installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. 565 U.S. 400, 404 (2012). In *Carpenter v. United States*,

> the Supreme Court held that individuals maintain a legitimate expectation of privacy in records of their physical movements as captured through cell-site location information ('CSLI'), that obtaining seven days of historical CSLI from a wireless provider without a

warrant was a search, that accessing 127 days of historical CSLI invaded the defendant's reasonable expectation of privacy, and thus the government must get a warrant supported by probable cause before obtaining CSLI from a wireless carrier.

*United States v. Spurlock*, 778 F. Supp. 3d 1136, 1142 (D. Nev. 2025) (summarizing *Carpenter*, 585 U.S. 296 (2018)). In *Carpenter*, the Court did "not express a view on matters not before [it]: real-time CSLI or 'tower dumps[,]'" and cautioned that its decision "is a narrow one." 585 U.S. at 316. As of today, neither the Supreme Court nor the Ninth Circuit has directly, "answered the question left open by *Carpenter*[:]" is real-time location tracking through a ping a search within the meaning of the Fourth Amendment? *Spurlock*, 778 F. Supp. 3d at 1142.

On June 29, 2026, the Supreme Court decided *Chatrie v. United States*, which held that "police officers invade cell-phone user's reasonable expectation of privacy when they access his Location History" thereby "conduct[ing] a search under the Fourth Amendment." 2026 WL 1855568, at *16. This decision can be read narrowly to establish a reasonable privacy expectation in retrospective location history,[3] which is distinct from real-time location data.

Because deciding this issue is not necessary to dispose of the two motions to suppress and the government does not argue to the contrary, it is assumed, but not

---

[3] In *Chatrie*, the Supreme Court identifies the "unimaginable privacy concerns" that such data gives rise to because of its ability to "reconstruct any person's movements retrospectively." 2026 WL 1855568, at *10.

11

decided, that the real-time location tracking of Montoya's phone through pings was a "search" within the meaning of the Fourth Amendment.

## II.    Montoya

Montoya argues that because the initial warrant application and Ping Warrant "issued on that application" were "'anticipatory' in nature," they are subject to additional requirements that were not met here. (Doc. 29 at 4 (citing *United States v. Grubbs*, 547 U.S. 90, 96–97 (2006).) Montoya insists because of this, the pinging of her phone was an illegal warrantless search and all subsequent evidence collected as a result, including the warranted searches of the Kia and her cell phone, is tainted and inadmissible. The government argues that because probable cause "already existed" at the time of issuance that "evidence would be found in the location pings by the mere passage of time[,]" the Ping Warrant "is valid and all evidence is admissible." (Doc. 34 at 10.) The government is correct that the Ping Warrant is valid.

### a.    Anticipatory Warrant

An ordinary search warrant requires the following to be constitutionally valid: it must be "issued by a neutral and detached magistrate;" "supported by probable cause;" and "describe[] . . .with sufficient particularity" the object of the search. *United States v. Ortega-Yescas*, 2019 WL 2299749, *5 (D. Mont. May 30, 2019) (citing *Dalia v. United States*, 441 U.S. 238, 255 (1979)).

"An anticipatory warrant is a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place." *Grubbs*, 547 U.S. at 94 (internal quotation marks omitted). In *Grubbs*, the Supreme Court explained that because "[a]nticipatory warrants are . . . no different in principle from ordinary warrants[,]" they require the following three factors to meet the probable cause requirement: "(1) . . . it is *now probable* that (2) contraband, evidence of a crime, or a fugitive *will be* on the described premises (3) when the warrant is executed." *Id.* at 96. However, "where the anticipatory warrant places a condition (other than the mere passage of time) upon its execution, the first of these determinations goes not merely to what will probably be found *if* the condition is met." *Id.* "Rather, the probability determination for a conditioned anticipatory warrant looks also to the likelihood that the condition will occur, and thus that a proper object of seizure will be on the described premises. In other words, for a conditioned anticipatory warrant to comply with the Fourth Amendment's requirement of probable cause, [the following] two prerequisites of probability must be satisfied." *Id.* First, "[i]t must be true . . . that *if* the triggering condition occurs there is a fair probability that contraband or evidence of a crime will be found in a particular place" and, second that, "there is probable cause to believe the triggering condition *will occur.*" *Id.* at 96–97. "The supporting affidavit must provide the magistrate with

13

sufficient information to evaluate both aspects of the probable-cause determination." *Id.* (internal citation and quotation marks omitted).

Montoya argues that because the Ping Warrant was anticipatory, but did not include a triggering condition, it "results in no warrant at all." (Doc. 29 at 9 (citing *United States v. Iwai*, 930 F.3d 1141, 1153 (9th Cir. 2019) (Bybee, J., dissenting).) In other words, Montoya insists that this is a situation in which law enforcement "sought to ping first and justify later[,]" which means the Ping Warrant "lacked probable cause from the moment it was signed." (Doc. 29 at 10.) The government disagrees and has the better argument.

Montoya's argument presents the threshold question of whether the Ping Warrant is an "anticipatory warrant" at all. As the government correctly points out, "[i]n a sense, all search warrants are anticipatory in nature because probable cause 'looks to whether evidence will be found *when the search is conducted.*'" (Doc. 34 at 6 (quoting *Grubbs*, 547 U.S. at 95 (emphasis in original)).) However, anticipatory search warrants typically seek to conduct searches triggered by a delivery of contraband. *See e.g., id.* ("The affidavit at issue . . . explained that execution of the search warrant will not occur unless and until the parcel containing child pornography has been received by a person(s)." (cleaned up)); *United States v. Vesikuru*, 314 F.3d 1116, 1118 (9th Cir. 2002) (involving "an anticipatory Search Warrant for the . . . residence once the package has been

14

accepted and observed to have been taken into the residence"); *United States v. Renderos*, 633 F. App'x 377, 379 (9th Cir. 2015) ("The triggering event to activate this anticipatory search warrant and permit its execution is once the beeper device alert [sic] agents, or the agents otherwise determine, that the SUBJECT PACKAGE has been opened . . . , at that point and with the warrant sought by this affidavit, agents will execute this warrant[.]"). Wire taps are also considered anticipatory because they rely on probable cause to believe "that particular communications concerning [an] . . . offense[] *will be obtained* through such interception." *Grubbs*, 547 U.S. at 95–96. Neither is the case here.

The Ping Warrant authorized the collection of "[l]atitud[inal] and longitud[inal]" "[r]eal-time location data of" Montoya's "actual cellular device" through certain "[g]lobal or regional navigation satellite system data" based on the Missoula Police Department's belief that the crime of criminal possession of drugs with intent to distribute "has been committed." (Doc. 28-2 at 1.) Montoya argues that the absence of conditional language in the search warrant application, (Doc. 28-1), and the Ping Warrant, (Doc. 28-2), are their Achilles' heel. The government, on the other hand, argues that "Montoya's warrant needed no triggering event because probable cause already existed." (Doc. 34 at 9.) The government is correct.

But even if the Ping Warrant is an anticipatory warrant, it is lawful under the

Fourth Amendment. Anticipatory warrants, which are "no different in principle from ordinary warrants," *Grubbs*, 547 U.S. at 96, must meet the requirement explained above of issuance by a neutral and detached magistrate, be supported by probable cause; and describe with sufficient particularity the object of the search. *United States v. Ortega-Yescas*, 2019 WL 2299749, *5 (D. Mont. May 30, 2019) (citing *Dalia v. United States*, 441 U.S. 238, 255 (1979)). Montoya argues a lack of probable cause and particularity.

"When officers have obtained a warrant, as they did here, a search's legality will ... depend on whether a magistrate has properly found probable cause to support a particularly described search." *Chatrie*, 2026 WL 1855568, at *17. Probable cause must be established by a supporting affidavit, *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985), and "means a fair probability that contraband or evidence is located in a particular place" and "[w]hether there is a fair probability depends on the totality of the circumstances, including reasonable inferences, and is a common sense, practical question." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (internal quotation marks omitted) (citing *Illinois v. Gates*, 462 U.S. 213, 230, 246 (1983)). "Neither certainty nor a preponderance of the evidence is required." *Id.* When reviewing an executed search warrant, courts "decid[e] whether the evidence viewed as a whole provided a 'substantial basis' for the Magistrate's finding of probable cause." *Massachusetts*

16

*v. Upton*, 466 U.S. 727, 732–33 (1984). For the probable cause necessary for an anticipatory search warrant, *Grubbs* requires a judge "to determine (1) that it is *now probable* that (2) contraband, evidence of a crime, or a fugitive *will be* on the described premises (3) when the warrant is executed[,]" *Grubbs*, 547 U.S. at 96.

"The particularity requirement, for its part, ensures that the search will be of an appropriate scope—that it is carefully tailored to its justifications, and will not take on the character of . . . wide-ranging exploratory searches[.]" *Chatrie*, 2026 WL 1855568, at *17 (internal quotation marks omitted). In evaluation of particularity, courts look to the search warrant itself, not the search warrant application, unless the application is incorporated in or accompanies the search warrant. *United States v. Hillyard*, 677 F.2d 1336, 1340 (9th Cir. 1982); *Sheppard*, 468 U.S. at 988 ("[A] warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional").

Here, the Judge reviewed the following facts to determine probable cause existed on May 28, 2025, that Montoya's location pings would provide evidence of drug trafficking by the mere passage of time:

- On April 3, 2025, Officer Nissley received contact from Confidential Informant MH280. The Informant relayed that he had messaged with Montoya on Facebook. In their messages, Montoya indicated "that she was in possession of methamphetamine for sale" and was looking for clientele. The Informant stated that Montoya had provided them with methamphetamine in 2024, and that the Informant had seen Montoya in possession of half a pound of methamphetamine and 10,000 fentanyl "M30" pills.

- On April 17, 2025, the Informant provided Montoya's cell phone number to Officer Nissley.

- On May 1, 2025, the Informant relayed that Montoya was still involved in drug distribution in Montana, including a recent trip to Butte

- On May 27, 2025, the Informant observed Montoya at a motel with methamphetamine and fentanyl. The informant also "noted that [Montoya] is traveling quite a bit and was last known to drive a white passenger car."

(*See* Doc. 28-1 at 2.) Taken together, reasonable inferences can be made based on these facts that pinging Montoya's location would provide evidence of a drug crime, particularly because the Informant provided information that Montoya was active in drug trafficking in May 2025, and the day before the application was made, she was observed by this Informant with both methamphetamine and fentanyl at a motel. *See United States v. Wilnau*, 2025 WL 3206734, at *5 (D. Mont. Nov. 17, 2025) (finding an application for a ping warrant "established a fair probability that the cell phone's . . . location data would yield evidence of drug trafficking" where "a commonsense reading of the . . . application supports [such a] conclusion[.]") Although "each of these facts individually would be insufficient to establish probable cause, considering the totality of the circumstances, the reasonable inferences drawn from them and paying great deference to the . . . judge's determination," there was a fair probability that evidence of a drug crime "was located in a particular place," specifically the location information for Montoya's cell phone. *United States v. Guadarrama*, 2026 WL 1146744, at *4

18

(S.D. Cal. Apr. 28, 2026). Accordingly, relying solely on the facts contained within the four corners of the search warrant application, *Stanert*, 762 F.2d at 778, the Judge had a substantial basis for concluding that probable cause existed to ping Montoya's phone at the time of the Ping Warrant's issuance.

As to particularity, unlike a geo-fence warrant with its "uncommon, multi-step" procedure and targeting of not "already-known suspect[s,]" *Chatrie*, 2026 WL 1855568, at *6, *17, the Ping Warrant specifically identified a single step, the "[r]eal-time location data" in "[l]attitude and longitude," and a single suspect, Montoya. (Doc. 28-2 at 1.) To be sure, the Ping Warrant did not specify the number of pings or the duration of pings, and included a nearly month-long date range of "05/08/2025–06/26/2025." (*Id.*) Thus, the "durational expanse of [this] search" is not "carefully tailored[.]" *Chatrie*, 2026 WL 1855568, at *17.[4] Nevertheless, the Ping Warrant was sufficiently particular to "enable the person conducting the search to reasonably identify the things authorized to be seized," *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986), here the location information for Montoya's cell phone.

Accordingly, because the Ping Warrant comports with the Fourth

---

[4] Although the government refers to the Ping Warrant as a "general search warrant," given the context, (Doc. 24 at 1, 6 ("Anticipatory warrants are no different in principle from general warrants.")), it appears the government is using "general" to distinguish between what would more appropriately be called an "ordinary warrant" and an "anticipatory warrant.

19

Amendment, Montoya's "fruits of the poisonous tree" argument need not be reached. Nevertheless, the events Montoya alleges to be unconstitutional are addressed and their constitutionality is confirmed below.

### b. Alternative Arguments

Montoya argues that the stop of the Kia, its search, the seizure and search of her cell phone, and the interview of Gabbard are all tainted by the unlawful Ping Warrant. However, as explained above, the Ping Warrant is lawful and any derivative evidence is not tainted. As explained below, each of these events is also otherwise constitutional.

### i.   Kia Stop and Seizure

Montoya argues that there was no triggering event in the Ping Warrant that would justify the May 29, 2025 traffic stop and seizure of the Kia, (Doc. 29 at 11–12), and because a "*Grubbs* illegality is identified, the burden shifts to the government to prove the evidence generates from an independent sources," (Doc. 38 at 4). In response, the government argues that there was particularized suspicion warranting the Kia stop and probable cause to seize the car under the automobile exception. The government is correct on both fronts.

### 1. Stop

Although Montoya is correct that the ping data factored into the traffic stop, there is no *Grubbs* illegality here to shift the burden and the particularized

20

suspicion required to conduct such a stop is a distinct inquiry from that of probable cause required for the issuance of a search warrant. There was particularized suspicion here.[5]

An officer may stop a vehicle even if no traffic violation occurs if facts known to the officers establishes "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Magallon-Lopez*, 817 F.3d 671, 674 (9th Cir. 2016) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *See United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) (internal quotation marks omitted). "The requirement of *particularized* suspicion encompasses two elements. First, the assessment must be based upon the totality of the circumstances. Second, that assessment must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (internal citations and footnote omitted). While the government has the initial burden of

---

[5] At the July 1, 2026 hearing, Montoya also specifically argued that an anticipatory search warrant was required once the Kia was located before law enforcement continued with their investigation. Not so. Only particularized suspicion was required to conduct the traffic stop of the Kia.

producing specific and articulable facts to support suspicion of illegal activity, the defendant has the burden of proof on a motion to suppress. *United States v. Waldeck*, 664 F. Supp. 3d 1169, 1176 (D. Mont. 2023). "Accordingly, once the government has presented specific and articulable facts to justify a search or seizure, a defendant must refute any evidence or testimony presented by the government in order to 'cast doubt' on the validity of that search or seizure." *Id.*

Here, through his monitoring of ping data, Officer Nissley observed Montoya enter Montana from Washington on May 29, 2025. (Doc. 27-1 at 2.) At that point, the Informant had relayed that Montoya was involved in drug distribution activity as recently as the very day prior when the Informant had seen her with both methamphetamine and fentanyl at a motel. (Doc. 28-1 at 2.) This Informant had previously purchased methamphetamine from Montoya and received Facebook messages from Montoya that indicated "she was in possession of methamphetamine for sale" and was looking for clientele the month prior. (*Id.*) The Informant also observed that "Montoya had been traveling quite a bit." (*Id.*) And, Officer Nissley had knowledge that "Washington state acts as a source of [dangerous drug] supply state for Montana." (Doc. 27-1 at 2.) Officer Nissley informed Trooper Adam that "he had a particularized suspicion Amanda Montoya was actively involved in the trafficking of bulk illegal narcotics." (*Id.* at 47.) Trooper Adams also had knowledge that Interstate 90 was a drug corridor for

22

transportation between Washington and Montana. (Adams.)[6] Using the ping data and surveillance on Interstate 90, the Kia was located and running the car's registration showed that the car was rented by "Cody Gabbard." (Doc. 27-1 at 2.) Officer Nissley had knowledge "from his training and experience that it is common for persons involved" in drug trafficking "to utilize rental vehicles" "to create a layer of ambiguity and prevent law enforcement efforts to identity the persons involved in the criminal behavior." (*Id.*) Trooper Adams also had knowledge that "use of a rental car in context of a drug trafficking investigation is significant" because "rental cars can give a trafficker a sense of anonymity," provide "reliability" compared to a personal car, and "can prevent law enforcement form forfeiting the trafficker's personally owned vehicles" if apprehended. (*Id.* at 47.) Trooper Adams then located the Kia and "observed a female who[se] appearance was consistent with Montoya's [drivers license] picture." (*Id.*) Observing no male in the car, Trooper Adams then recognized that the Kia was a third-party rental. (Adams.) This added to Trooper Adams' suspicion because third-party rental cars are commonly used in drug trafficking to provide an additional step preventing identification of vehicle operators. (*Id.*) Thus, the totality of the circumstances here provided specific and articulable facts upon which reasonable inferences

_____

[6] At the July 1, 2026 hearing, Montoya acknowledged that travelling from Western states, which serve as drug source states, to Montana would give rise to some sort of suspicion.

could be drawn that warranted an investigatory stop of Montoya based on suspected drug activity.

## 2. Seizure

"The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012). The government has met that burden here.

Under the automobile exception, warrantless seizure of a vehicle is permitted if there is "probable cause to believe contraband or evidence is contained" in that vehicle. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Bagley*, 772 F.2d 482, 491 (9th Cir. 1985) ("[T]he existence of probable cause alone justifies a warrantless search or seizure of a vehicle lawfully parked in a public place.") "[T]he automobile exception does not have a separate exigency requirement[.]" *Maryland v. Dyson*, 527 U.S 465, 467 (1999). "Probable cause exists if there is a fair probability that contraband or evidence of a crime will be found in a particular place, under the totality of the circumstances." *United States v. Faagai*, 869 F.3d 1145, 1150 (9th Cir. 2017) (internal quotation marks omitted). The "totality of the circumstances" "includ[es] reasonable inferences, and is a commonsense, practical question. Neither certainty nor a preponderance of the evidence is required." *Kelley*, 482 F.3d at 1050 (internal

24

citations and quotation marks omitted).  While "[a] finding of probable cause must be supported by objective facts known to the officer at the time of the search," *Faagai*, 869 F.3d at 1150 (internal quotation marks omitted), it may be based on the collective knowledge of law enforcement, *United States v. Ramirez*, 473 F.3d 1026, 1032–33 (9th Cir. 2007) (explaining that "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned[,]" courts "aggregate the facts known to each of the officers involved at least when there has been communication among agents" (internal quotation marks omitted)); *see also Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983) ("[W]here law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.").

Once the Kia traffic stop occurred, Trooper Adams deployed his "narcotics detecting K9," "Hary," who "indicated at the front passenger door." (Doc. 27-1 at 2.)  "[A] positive dog sniff is strong evidence toward a showing of probable cause." *United States v. $191,910 in U.S. Currency*, 772 F. Supp. 473, 480–81 (N.D. Cal. 1991) (internal quotation marks omitted) (collecting cases).  Further, at this time, Officer Nissley had already informed Trooper Adam that "he had a particularized suspicion Amanda Montoya was actively involved in the trafficking of bulk illegal narcotics" and that she was in a "rental car," (Doc. 27-1 at 47.) Such a rental had significance to both Officer Nissley and Trooper Adams, given

25

their training and experience, because "it is common for persons involved" in drug trafficking "to utilize rental vehicles." (*Id.*) As explained above, Trooper Adams became more suspicious after identifying the Kia as a third-party rental, which is also commonly used in drug trafficking. Trooper Adams had also observed the Defendants frantically moving objects in the vehicle when the stop first occurred. (Adams.) Given the information provided to Trooper Adams by Officer Nissley, Trooper Adams' own observations, and Hary's indication of the presence of drugs, these objective facts collectively known to law enforcement support a reasonable inference that there was a fair probability that contraband or evidence of a crime would be found in the Kia. Accordingly, the automobile exception applies here.[7]

### ii.   Phone Warrant

Montoya briefly argues that because the "phone warrants depended entirely on the May 29, 2025[] seizure" and the second phone warrant was delayed by a month, any evidence derived from her cell phone should be suppressed. (Doc. 29 at 14–15.)

As explained above, the Kia seizure was lawful under the automobile exception and Montoya's cell phone was located in that vehicle. (Doc. 28-6.) As to the delay, courts "determine whether [such] delay was 'reasonable' under the

---

[7] Kunz concedes that the "K-9 alert may have supplied probable cause to search the vehicle under the automobile exception." (Doc. 27 at 11.)

26

totality of the circumstances," and "on a case-by-case basis." *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015).  Here, the delay is explained in Officer Potter's police report.  (Doc. 28-10.)  On June 4, 2025, the search warrant for Montoya's cell phone, (Doc. 28-8), and the search warrant for Kunz's cell phone issued, (Doc. 28-10 at 1).  That same day, Officer Potter received those search warrants and attempted to download the cell phones, but both cell phones' software "was not supported" by Cellebrite forensic analysis software, so she "returned both devices to evidence." (*Id.*)  "In July 2025, Cellebrite announced more support for devices" like the Defendants' cell phones and Officer Potter updated her software. (*Id.* at 2.)  She then notified Officer Nissley of the update. (*Id.*)  On July 11, 2025, Officer Nissley sought and was granted a new search warrant for Montoya's cell phone, (Doc. 28-12), and Kunz's cell phone, (Doc. 27-1 at 62–70).  Officer Potter was able to access both Defendants' cell phones using the new software. (Doc. 28-10 at 2.)  Under the totality of the circumstances, this delay was reasonable.

### iii.   Gabbard Interview

Finally, Montoya argues that the Gabbard interview is suppressible fruit because "there is an unmistakable straight line of taint between the warrantless real time tracking of [Montoya's] cell phone . . . and the interview of . . . Gabbard" and agents confronted Gabbard "with conversations extracted from illegally seized phone(s)." (Doc. 29 at 13, 15.)  As explained above, because the real-time tracking

of Montoya's cell phone and its search and seizure were lawful, her argument fails.

## III.    Kunz

Kunz argues for suppression on six grounds.  First, Kunz argues that if the government cannot prove issuance of a valid warrant before the first ping of Montoya's cell phone, each ping, all ping-related data, and all evidence that stems from the use of the ping data (including the Kia stop) must be suppressed.  Second, she argues that even if a pre-ping warrant issued, the Ping Warrant is invalid due to numerous insufficiencies.  Third, Kunz argues that during the Kia stop, the seizure of her person "became a de facto arrest" when she was put in the back of the police car and that such an arrest requires probable cause, which was absent.  (Doc. 27 at 12.)  Fourth, Kunz argues that the seizure of her phone was unlawful because it lacked probable cause, meaning all derivative evidence must be suppressed.  Fifth, Kunz asserts that the search warrant for her phone is invalid because it is overbroad and lacks probable cause, meaning all evidence from her phone should be suppressed.  Lastly, Kunz argues that the Gabbard-related evidence and later investigative leads are fruits of the poison tree based on the "unconstitutional [Kia] stop, [her] detention, [her] phone seizure, and phone extraction," which must be suppressed "unless the government proves an independent source or attenuation." (Doc. 27 at 16.)  The government disagrees on all fronts and argues that Kunz lacks standing to challenge the Ping Warrant and Gabbard's interview.  Ultimately,

the government's arguments are more persuasive.

### a. Standing

As a threshold matter, the government argues that Kunz does not have standing to challenge the Ping Warrant, which tracked Montoya's cell phone. That argument has merit.

> In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.

*Alderman v. United States*, 394 U.S. 165, 173 (1969) (quoting *Jones v. United States*, 362 U.S. 257, 261 (1960)). "[A] defendant may challenge a search of a third party's property if he or she had a reasonable expectation of privacy in the place searched based on a formal arrangement indicating joint control or supervision." *United States v. Lingenfelter*, 997 F.2d 632, 636 (9th Cir. 1993). Absent such arrangement, co-defendants do not have "an expectation of privacy vis-à-vis the other person's ping location," meaning that "each defendant has standing to challenge his or her own ping warrant and nothing more." *United States v. Torres*, 2026 WL 74159, *5 (D. Idaho Jan. 9, 2026); *cf. United States v. Guadarrama*, 2026 WL 1146744, *3 (S.D. Cal. Apr. 28, 2026) (finding the defendant "met his burden of demonstrating standing to contest the search warrant of [a] [c]ellphone" because it "was

29

registered to [his] mother, providing a sufficient link to [the d]efendant, and [he] had a property interest in the phone"). In the absence of such evidence here, Kunz lacks standing to challenge the Ping Warrant.

Accordingly, because Kunz did not have an expectation of privacy in Montoya' ping data, she lacks standing to challenge the Ping Warrant.

### b. Pre-Ping Warrant Action and Ping Warrant Sufficiency

As explained above, because Kunz lacks standing to challenge the Ping Warrant, her challenge on the grounds of pre-ping warrant action[8] and Ping Warrant sufficiency fails.

### c. Stop of Kia and Seizure of Kunz's Person

Kunz briefly argues that "[i]f the pings were unlawful, the stop was fruit of the poisonous tree." (Doc. 37 at 6; *see* Doc. 27 at 10.) This argument is addressed above, and fails because the pings were not unlawful. Kunz also argues that the government "must prove when Kunz's *Terry* detention became an arrest" and that because Kunz presented "no 'safety' concern," her *de facto* arrest cannot be justified. (Doc. 27 at 11–12.)

In response, the government states that "by not complying with Trooper

---

[8] At the July 1, 2026 hearing, Officer Nissley explained that all pings of Montoya's cell phone occurred after the Ping Warrant was served because it would be impossible to obtain such data before serving a cell phone service provider with a search warrant. (Nissley.)

Adams' requests and arguing with him, she was obstructing his ability to safely investigate," which "landed her in handcuffs in the back of a patrol car." (Doc. 33 at 11.) The government insists that Deputy Lindauer learning that Kunz had a Washington "no bond warrant for impersonation" shortly after her detention further warranted detaining her, and K-9 Hary alerting to the passenger-side door where Kunz had been seated established further probable cause for her detention. (*Id.* at 12.) Ultimately, the government's argument is more persuasive.

A passenger is seized when a traffic stop is made and has the right to challenge the legality of the stop. *Brendlin v. California*, 551 U.S. 249, 255, 258–59 (2007). "[D]uring a lawful traffic stop an officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk." *Id.* at 258. But "at some point," an investigative stop "can no longer be justified as an investigative stop" and turns into an unconstitutional *de facto* arrest. *United States v. Sharpe*, 470 U.S. 675, 685 (1985). "To determine whether a *Terry* stop has escalated into a full-blown arrest, [courts] consider the severity of the intrusion, the aggressiveness of the officer's actions, and the reasonableness of the officer's methods under the circumstances." *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 940 (9th Cir. 2020). When considering the reasonableness of the officer's methods under the circumstances, courts consider "whether the officer had sufficient basis to fear for his safety to warrant the

31

intrusiveness of the action taken." *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014) (internal quotation marks omitted). "This inquiry is undertaken from the perspective of law enforcement, while bearing in mind that the purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence." *Id.* (internal quotation marks and alteration omitted). The use of "especially intrusive means" in effectuating *Terry* stops has been held permissible in certain circumstances, including:

> 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur.

*Reynaga Hernandez*, 969 F.3d at 940–41 (internal quotation marks omitted).

Here, Trooper Adams' request that Kunz exit the vehicle was a permissible "precautionary measure," *Brendlin*, 551 U.S. at 258, and Kunz does not challenge her later actual arrest. Rather, she asserts that handcuffing her and placing her in the back seat of the patrol car constituted a *de facto* arrest, which lacked probable cause. Kunz is incorrect.

Although "[h]andcuffing as a means of detaining an individual does not automatically escalate a stop into an arrest," "it substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *Reynaga Hernandez*, 969 F.3d at 941 (internal quotation

marks omitted). Here, once out of the vehicle, Kunz inquired about Trooper Adams' ability to detain her as a passenger in the car, and she lied to him about the blow torch that was found at her feet. (Lindauer Body Cam at 2:10–15.) Trooper Adams then asked if there were drugs in the car and Kunz did not respond, and instead stated, "search my person." (*Id.* at 2:59.) She also used profanity when speaking with the officers. (*Id.* at 3:48.) Once handcuffed and seated in the back of Deputy Lindauer's patrol car, he rolled the window down at her request. (*Id.* at 3:57, 4:33.) Soon after, Trooper Adams deployed K-9 Hary. (Lindauer Dash Cam at 6:00.) Kunz informed Deputy Lindauer that she had a warrant related to child custody, but after Kunz provided her name, Deputy Lindauer learned from dispatch that she had a no-bond warrant out of Washington for impersonation. (Lindauer Body Cam at 9:30, 11:58.)

Through her actions of failing to comply with the officers' requests and speaking untruthfully to them, Kunz was "uncooperative" and Trooper Adams and Deputy Lindauer were unable to continue with their investigation, including deployment of K-9 Hary. *Reynaga Hernandez*, 969 F.3d at 940; *cf. United States v. In*, 124 F.4th 790, 795 (9th Cir. 2024) (explaining that a driver detained during a traffic stop "became uncooperative when he answered untruthfully the officer's question about having a gun[, which the officer had seen,] in his car"). As to the aggressiveness of the officer's actions, the action of handcuffing Kunz was not

particularly aggressive, and Deputy Lindauer opened a window for her and later spoke to her with the back door open. (*E.g.*, Body Cam at 6:41.) In terms of safety risk, the car stop occurred on the side of Interstate 90. Body and dash camera footage of the stop shows that cars and semi-trailer trucks were travelling at high speeds next to the stop. Because of this location, Trooper Adams' priority was highway safety, and he sought to avoid a pursuit or any other interference with traffic on the Interstate. (Adams.) Given her uncooperative nature and the stop's proximity to a busy highway, the method used to detain Kunz was reasonable. Accordingly, on balance, the *Terry* stop of Kunz did not escalate into a *de facto* arrest without probable cause.

### d. Seizure of Kunz's Phone

Kunz argues that the seizure of her phone was unlawful because it was warrantless and lacked probable cause. In response, the government argues that this warrantless seizure was lawful to prevent destruction of evidence and to maintain officer safety. The government is correct.

A warrantless seizure of personal property requires probable cause and exigent circumstances. *United States v. Licata*, 761 F.2d 537, 541 (9th Cir. 1985). Exigent circumstances include circumstances that would "cause a reasonable person to believe . . . prompt action[] was necessary to prevent . . . the destruction of relevant evidence." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.

34

1984). "The Supreme Court has found reasonable 'a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period.'" *United States v. Powell*, 2025 WL 853250, at *1 (9th Cir. Mar. 19, 2025) (quoting *Illinois v. McArthur*, 531 U.S. 326, 334 (2001)). Cell phones "are not just another technological convenience," because "they hold for many Americans the privacies of life." *Riley v. California*, 573 U.S. 373, 403 (2014).

Here, Kunz's phone was on her person as she stood outside the patrol cars during the Kia traffic stop. (Body Cam at 2:51.) Trooper Adams had observed "a propane bottle torch head on the passenger side floorboard" when Kunz exited the vehicle. (Doc. 27-1 at 2.) Kunz's phone was taken just before she was handcuffed and after she had repeatedly stated, "search my person." (*Id.* at 3:10.) At this point, having informed Defendants that a drug investigation was being pursued and that deployment of K-9 Hary was imminent, it would be reasonable for the officers to have concern regarding "destruction or erasure of digital evidence," *Powell*, 2025 WL 853250, at *1, if the phone was returned to Kunz. Because the Kia stop occurred on the side of a busy highway, another concern to law enforcement was the use of the phone to alert others to their location. (Adams.)

As discussed above, "[p]robable cause exists if there is a fair probability that contraband or evidence of a crime will be found in a particular place, under the

35

totality of the circumstances." *Faagai*, 869 F.3d at 1150. The "totality of the circumstances" "includ[es] reasonable inferences, and is a commonsense, practical question." *Kelley*, 482 F.3d at 1050. Probable cause may be based on the collective knowledge of law enforcement. *Ramirez*, 473 F.3d at 1032–33. Here, given the collective knowledge of law enforcement from the Informant information, ping data, and other background information from which it can be reasonably inferred that Defendants were on a drug run, and the blow torch head observed at Kunz's feet, there was fair probability that evidence of drug activity would be found on Kunz's phone.

As explained above, a search warrant for Kunz's phone was first obtained less than a week after the Kia stop, and the software-related delay for the second search warrant was reasonable. (*See* Doc. 28-10.) Further, the unique nature of cell phones containing "the privacies of life" is balanced here because the phone was not searched by officers during the stop and was stored without connection to service and in evidence. (Doc. 28-10); *see Powell*, 2025 WL 853250, at *1 ("There is no indication [of] any unnecessary intrusions into [defendant]'s privacy interests, given that the phone was locked and in airplane mode during the entire period.")

Because there was probable cause, this temporary seizure, which prevented the loss of evidence and occurred while officers obtained a search warrant in a

reasonable time period, was reasonable.

### e. Search Warrant for Kunz's Phone

Kunz argues that because Officer "Nissley's Application for Search Warrant at issue was overly broad," it "did not include any specific facts which would provide a reasonable basis to believe Kunz . . . was involved in dangerous activity." (Doc. 27 at 15.) That argument is unpersuasive. The July 11, 2025 search warrant for Kunz's phone[9] authorized the seizure for the following:

> All data currently stored in or related to the account or device identified herein related to the possession, manufacture, production, or distribution of dangerous drugs as defined by § 50- 32-101, MCA, or drug paraphernalia as defined by § 45-10-101, MCA, including but not limited to:
>
> > - Global or regional navigation satellite system data, including data from the Global Positioning System (GPS), Global Navigation Satellite System (GLONASS), BeiDou Navigation Satellite System (BDS), and similar systems;
> > - Latitude and longitude data;
> > - Location history,
> > - IP addresses;
> > - Activity history or logs;
> > - Address book or calendar data;
> > - Contact forwarding data;
> > - Photographs, audio or video files;
> > - Metadata;
> > - Email messages and attachments;
> > - Documents or other text-based files;
> > - Timeline history;
> > - Public profiles;
> > - Login history;

---

[9] This was the second search warrant for Kunz's phone, (Doc. 27-1 at 62–70), which was sought following the Cellebrite software update, (Doc. 28-10 at 1).

- Browsing or search history;
- Visited websites;
- Text messages (SMS);
- Media messages (MMS);
- Instant messages;
- Privacy settings;
- Account information, including any linked financial or credit card accounts;
- Any data on a linked social media or communication account or application.

(Doc. 33-1 at 1–2.)  This search warrant was obtained before Kunz's cell phone contents were searched.  *Riley*, 573 U.S. at 401 (2014) ("[A] warrant is generally required before . . . a search" of "information on a cell phone.")  While particularity must be established by the search warrant itself, *Hillyard*, 677 F.2d 1336, 1340 (9th Cir. 1982), probable cause must be established by a supporting affidavit, *Stanert*, 762 F.2d at 778.

Beginning with probable cause, the search warrant application includes the information provided by the Informant regarding Montoya's drug activity, the pings from the Ping Warrant, the surveillance and traffic stop of the Kia, the search of the Kia, and the first round of search warrants for Defendants' cell phones. (Doc. 27-1 at 62–68.)  As to Kunz, the application includes that K-9 Hary "indicated on the front passenger door" of the car in which Kunz had been a passenger, (*id.* at 65), that "a banded wad of cash was located in the glove compartment of the front passenger seat," (*id.* at 66), and a purse behind the passenger seat "contained a glass pipe with residue of suspected

38

methamphetamine, (*id.*). The search application also includes the fact that the rented Kia had been coming from Washington into Montana and that dangerous drugs were discovered inside. (*Id.* at 65.) As explained above, based on their training and experience, the route from Washington to Montana and the use of a rental car had significance to law enforcement because "Washington state acts as a source of supply state for Montana," and "it is common for persons involved in the transportation, sale, or purchase of dangerous drugs to utilize rental vehicles." (*Id.* at 65.) Taken together, these specific facts permit a reasonable inference that evidence of drug activity would be located on Kunz's cell phone. Accordingly, relying solely on the facts contained within the four corners of the search warrant application, the judge had a substantial basis for concluding that probable cause existed.

As to particularity, this requirement "varies depending on the circumstances of the case and the types of items involved." *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996). Here, evidence of a crime in the form of phone contents "are seldom found neatly separated from their non-seizable counterpart." *United States v. O'Dell*, 483 F. Supp. 3d 757, 763 (9th Cir. 2020) (internal quotation marks omitted). Thus, "it is reasonable under the Fourth Amendment to authorize a wholesale seizure if the supporting affidavit explains why such a seizure is necessary." *Id.* Here, the affidavit explains that "it is common for persons

39

involved in dangerous drugs transactions to keep . . . cellular phones on their persons prior to, during, and after dangerous drugs transactions[;]" and to "frequently utilize cellular phones to facilitate the crime of drug distribution and these cellular phones contain evidence of said crimes[, s]pecifically, cellular phones are used to text and call associates, co-conspirators, and partners to facilitate drug distribution and payment for those substances and/or conceal evidence of other crimes." (Doc. 27-1 at 64–65.) Thus, the search and seizure sought for the contents of Kunz's phone is justified here. Accordingly, the July 11, 2025 search warrant for Kunz's phone was not impermissibly overbroad.

### f. Gabbard Evidence

Finally, Kunz argues that if the government "seeks to use [any of] Gabbard's statements," "it must prove those statements came from an independent source untainted by the illegal seizure and search of Kunz's phone." (Doc. 27 at 17.) The government argues that because the Ping Warrant led "law enforcement to the Kia," Kunz "lacks standing to challenge derivative information." (Doc. 33 at 19.) Alternatively, the government argues that "the information was obtained through a valid warrant and should not be suppressed." (*Id.*) The government's second argument is persuasive.

As a preliminary matter, because Kunz has a reasonable expectation of privacy in her cell phone contents, she has standing to challenge their search or

seizure. *See Alderman*, 394 U.S. at 173. However, as explained above, both the Ping Warrant and the July 11, 2025 warrant for Kunz's phone are lawful so the Gabbard interview is not tainted by those searches.

CONCLUSION

Based on the foregoing, Kunz's motion to suppress, (Doc. 26), and Montoya's motion to suppress, (Doc. 28), are DENIED.

DATED this 6ᵗʰ day of July, 2026.

12:57 P.M

Donald W. Molloy, District Judge
United States District Court